**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

LODGY JACKSON, )
)
Movant, )
)
v. ) CRIM NO. 4:11-cr-00351-AGF-2
)
UNITED STATES OF AMERICA, )
)
Respondent. )

## MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) AND THE FIRST STEP ACT OF 2018

COMES Movant, LODGY JACKSON ("Jackson"), appearing *pro se,* and respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement and a period of supervised release. The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Jackson's health. The virus thrives in densely packed populations, and the USP is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Jackson. Jackson's diagnosed medical conditions make him especially vulnerable to the deadly risks of COVID-19. Allowing Jackson to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the novel coronavirus.

## I. JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id.* However, Congress has allowed an exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

## II. PROCEDURAL HISTORY

### A. Procedural Background

On August 25, 2011, a grand jury sitting in the United States District Court for the Eastern District of Missouri, Eastern Division, returned a six (6) Count Indictment charging Jackson and two co-defendants, Andreus O'Bryant ("O'Bryant") and Scott Alan Compton ("Compton"). See Doc. 2.[1] Count 1 charged Jackson with Conspiracy

---

[1]

"Doc." refers to the Docket Report in the United States District Court for the Eastern District of Missouri, Eastern Division, in Criminal No. 4:11-cr-00351-AGF-2, which is followed by the Docket Entry Number. "CvDoc." refers to the Docket Report in the United States District Court for

to Possess with Intent to Distribute 500 or More of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(b)(ii)(II), and 846. *Id.* Count 2 charged Jackson with Conspiracy to Possess a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(o). *Id.* Count 3 charged Jackson with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C.§ 924(c)(1)(A) and 18 U.S.C. § 924(j)(1). *Id.*

On February 8, 2013, a Change of Plea Hearing was held and Jackson entered a plea of guilty as to Counts 1, 2, and 3 of the Indictment, pursuant to a written Plea Agreement. See Docs. 156, 157.

On December 12, 2013, Jackson was sentenced to a total term of 400 months' imprisonment, 5 years Supervised Release, Restitution in the total amount of $1,500, and a Mandatory Special Assessment Fee of $300. See Docs. 246, 247.

On December 23, 2013, Jackson timely filed a Notice of Appeal. See Doc. 252.

On April 10, 2015, the United States Court of Appeals for the Eighth Circuit ("Eighth Circuit") issued an Order affirming the judgment of the District Court. See Docs. 309, 310.

On July 14, 2016, Jackson filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"), which

---

the Eastern District of Missouri, Eastern Division, in Civil No. 4:11-cr-00351-AGF-2, which is followed by the Docket Entry Number.

was denied on August 12, 2019. See CvDocs. 1, 16, 17.

## B. **Statement of the Facts**

### 1. Offense Conduct

The factual background set forth below is based on the evidence presented at

O'Bryant's sentencing hearing:

> Jamie Benson was a drug dealer who sold marijuana and cocaine. He
> lived in Houston with his roommate, Deallen Nettles. Benson and Nettles
> traveled to St. Louis in March 2011 to sell one kilogram of cocaine.
> According to Nettles, O'Bryant led them to a house in St. Louis, where
> the sale was supposed to take place, but they were robbed instead. So
> ended Benson's first St. Louis-based drug venture.
>
> In early April 2011, O'Bryant purchased plane tickets for Jackson and
> Desmond Stringfellow to travel from Houston to St. Louis. Around that
> same time, O'Bryant and Benson began discussing the sale of a half
> kilogram of cocaine. Stringfellow testified that he, O'Bryant, and Jackson
> agreed to steal the cocaine and kill Benson. O'Bryant gave Stringfellow
> a .32 caliber firearm and gave Jackson a .40 caliber Glock.
>
> In late April 2011, Benson persuaded Nettles to travel with him to the St.
> Louis area to sell a half kilogram of cocaine. Benson told Nettles that
> things were going to be different this time and that "[Benson] wouldn't let
> anyone see the drugs until he saw some money." An older woman known
> as "Aunt Pat" accompanied Benson and Nettles, and the three left on
> April 20, 2011, driving through the night and arriving at an apartment
> complex in Washington, Missouri, on the afternoon of April 21, 2011.
> According to Nettles, they went to a second-floor apartment to meet
> O'Bryant, Jackson, and Stringfellow. Shortly after they arrived, Scott
> Compton entered the apartment and followed O'Bryant to a room in the
> back of the apartment. Compton later exited the back room, spoke briefly
> to the group, and left the apartment. Compton testified that O'Bryant had
> asked him to come to the apartment, act as if he were going to purchase

4

the cocaine, and say, "[W]e don't do business like that up here in Missouri." Compton went along with the plan.

After Compton left, Benson, Nettles, and Aunt Pat followed O'Bryant, Jackson, and Stringfellow to Compton's house. Compton exited his house and entered O'Bryant's truck carrying a plastic bag, which Nettles believed held cash. Compton testified that O'Bryant had instructed him to carry a plastic bag and that "[i]t was supposed to look like it had money in it." According to Nettles, O'Bryant told the others that they would continue to another house to pick up the rest of the money needed to complete the transaction. After driving for about an hour, they stopped in a rural area. O'Bryant then supposedly took Compton to obtain the rest of the money, leaving the others to wait in the dark, wooded area.

Stringfellow and Compton testified that there was never going to be a drug deal. Stringfellow explained that Compton played the role of a "fake buyer" so that O'Bryant and the others could locate the cocaine, which—unbeknownst to them—was hidden in the rear bumper of Nettles's car. According to Stringfellow, O'Bryant had given instructions to kill Benson and his companions once the cocaine was located. Stringfellow was supposed to kill Nettles, and Jackson was supposed to kill Benson and Aunt Pat.

When O'Bryant and Compton returned to the location where the others were waiting, O'Bryant indicated that the transaction could be completed. According to Stringfellow, "[O'Bryant] told us to do it then, soon as he sees the cocaine, soon as he brings it out to kill them then." Benson exited Nettles's vehicle and moved toward the rear bumper, but he did not retrieve the cocaine because a downpour interrupted the transaction.
The occupants of the two vehicles then drove to a gas station. Out of the view of O'Bryant, Jackson, and Stringfellow, Benson took the cocaine from its hiding place and brought it inside Nettles's car. Everyone then returned to the St. Louis area. Compton went home, and the others reconvened at O'Bryant's house. According to Nettles, O'Bryant said that Compton had called repeatedly and indicated that he wanted to complete the transaction. O'Bryant, Jackson, and Benson then left the house. Nettles, Aunt Pat, and Stringfellow went to a fast-food restaurant, ordered

5

food, and then returned to O'Bryant's house. Nettles concealed the cocaine in the fast-food bag and hid the bag in a couch. Stringfellow went upstairs and fell asleep.

Nettles recounted his final conversation with Benson. Nettles called Benson, who said that O'Bryant and Jackson were going to "hit a lick," meaning that they were going to commit robbery to obtain the money needed to purchase the cocaine. Benson said that he had told the men that he did not want to be involved in any robbery. Nettles offered to pick up Benson, who declined the offer and thereafter ended the phone call.

Nettles called Benson several times after that conversation. When the calls went straight to voicemail, Nettles knew something was wrong. He and Aunt Pat decided to leave O'Bryant's house, taking with them the cocaine and a piece of mail that bore O'Bryant's full name and address. When Stringfellow awoke, Nettles and Aunt Pat were gone. O'Bryant later returned. According to Stringfellow, O'Bryant was furious when he discovered that the cocaine and Benson's companions were gone.

According to Stringfellow, O'Bryant said, "I lost everything, Lodgy killed him." Stringfellow testified that he accompanied O'Bryant to the garage where O'Bryant's truck was parked. Stringfellow put on gloves, reached inside the truck, and grabbed his return plane ticket. Stringfellow noticed that there was "[b]lood and [a] bullet hole, bleach and a whole bunch of things in the car." When asked what Jackson had said about the incident, Stringfellow replied,

> He told me that [O'Bryant] was inside the house and they were outside in the alley and [O'Bryant] was playing like he was going to rob [another drug dealer] so that [Benson] could get out of the car and they wouldn't have to kill him in the car, but that wasn't working. [Jackson] said he kept texting [O'Bryant], saying let me do it, let me do it now, can I do it now and he wasn't getting an answer. . . . [Jackson] said he killed [Benson], he hit him from the backseat, [Jackson] and [another man] drug him out of the car and [Jackson] took off.

6

Stringfellow observed Jackson using a hammer in an attempt to destroy the .40 caliber Glock that was used to kill Benson.

After Nettles sold the cocaine in Chicago, he and Aunt Pat returned to Houston. Nettles called the police department in O'Fallon, Missouri, to report that Benson was missing and provide information about O'Bryant. Nettles later learned that Benson had been found dead in an alley.

See Doc. 309 at 3-6.

## 2. Plea Proceeding

On February 8, 2013, a Change of Plea Hearing was held before District Judge Audrey G. Fleissig. See Doc. 156. Jackson entered a plea of guilty as to Counts 1, 2, and 3 of the Indictment, pursuant to a written Plea Agreement. See Doc. 157. In exchange for Jackson's guilty plea, the government agreed to recommend a sentence of 360 months' imprisonment. The plea agreement stated that the district court "alone will determine whether to accept the [government's] recommendation." *Id.* at 5.

## 3. Sentencing Proceeding

Under the United States Sentencing Guidelines (Guidelines), Jackson's final sentencing range was 480 months' imprisonment to life.[2] Jackson requested a 240-

---

2

Jackson's Total Offense Level for Counts 1 and 2 was 40, his Criminal History Category was

month sentence. The government recommended a 360-month sentence.

On December 12, 2013, a Sentencing Hearing was held before District Judge Fleissig. See Doc. 246. After considering the sentencing factors set forth in 18 U.S.C. § 3553(a), the district court imposed a sentence of 400 months' imprisonment: a 280-month sentence on Count 1, a concurrent 240-month sentence on Count 2, and a consecutive 120-month sentence on Count 3. See Doc. 247. A timely Notice of Appeal was filed on December 23, 2013. See Doc. 252.

### 4. Appellate Proceeding

On Appeal, Jackson argues that his guilty plea was not knowing and voluntary because the district court did not adequately advise him of his rights. He also contends that his sentence is substantively unreasonable unreasonable. On April 10, 2015, the Eighth Circuit affirmed Jackson's sentence and conviction. See *United States v. Jackson*, 14-1084 (8th Cir. 2015).

### 5. Postconviction Proceeding

On July 14, 2016, Jackson filed a § 2255 Motion, asserting six claims of ineffective assistance of trial counsel, and a single claim of ineffective assistance of

---

III, and his sentencing range was 360 months' to life imprisonment. Count 3—possession, brandishing, and discharge of a firearm in furtherance of a drug-trafficking crime—carried a mandatory, consecutive sentence of at least ten years' imprisonment. See 18 U.S.C. § 924(c)(1)(A)(iii).

appellate counsel. See CvDocs. 1, 5. On August 12, 2019. the Court denied Jackson's § 2255 Motion and denied to issue a Certificate of Appealability ("COA"). See CvDocs. 16, 17.

## III. DISCUSSION

As a preliminary matter, Jackson respectfully requests that the Court be mindful that "a *pro se* complaint should be given liberal construction, we mean that if the essence of an allegation is discernible ... then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." See *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015); *Estelle v. Gamble*, 429 U.S. 97 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519 (1972) (same).

## A. Jackson's Current Conditions of Confinement and Health Conditions.

1. Defendant, Lodgy Jackson, was sentenced in 2013 for drug conspiracy (Count 1); conspiracy to possess a firearm in furtherance of a drug trafficking crime (Count 2); and possession of a firearm in furtherance of a drug trafficking crime (Count 3). This gave Jackson a total term of 400 months' imprisonment.

2. Jackson, age 31, currently housed at United States Penitentiary, in Pollock, Louisiana ("USP Pollock).

3. Jackson's projected release date is on February 12, 2040. However, he suffers from incurable, progressive disease, from which Jackson will never recover, Sickle Cell Disease and has

9

recently contracted coronavirus (COVID-19).[3]

## B. Under the First Step Act, this Court Has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify Jackson's Sentence and Release Him to Home Confinement.

The First Step Act ("FSA") expressly permits Jackson to move this Court to

reduce his term of imprisonment and seek compassionate release. See 18 U.S.C. §

3583(c)(1)(A)(i). Under normal circumstances, a defendant can seek recourse through

the courts after either (1) the BOP declines to file such a motion on his behalf; or (2)

there has been of lapse of 30 days from the warden's receipt of the defendant's request,

whichever is earlier. *Id.* Jackson files this motion now in light of the urgent nature of

this matter. See discussion, infra Part i. A.

After exhausting the administrative process, "a court may then 'reduce the term

of imprisonment' after finding that 'extraordinary and compelling reasons warrant such

---

3

Jackson was not able to get a copy of his medical records from the BOP. Should the Court require Jackson's medical records, Jackson respectfully requests the Court to subpoena his medical records from the BOP (USP Pollock).

*Sickle Cell Disease (SCD)*. SCD is a group of inherited red blood cell disorders. Healthy red blood cells are round, and they move through small blood vessels to carry oxygen to all parts of the body. In someone who has SCD, the red blood cells become hard and sticky and look like a C-shaped farm tool called a "sickle". The sickle cells die early, which causes a constant shortage of red blood cells. Also, when they travel through small blood vessels, they get stuck and clog the blood flow. This can cause pain and other serious problems such infection, acute chest syndrome and stroke.

*COVID-19*. COVID-19 is the disease caused by the new coronavirus that emerged in China in December 2019. COVID-19 symptoms include cough, fever or chills, shortness of breath or difficulty breathing, muscle or body aches, sore throat, new loss of taste or smell, diarrhea, headache, new fatigue, nausea or vomiting and congestion or runny nose. COVID-19 can be severe, and some cases have caused death.

10

a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Ebbers*, 2020 WL 91399, at \*4, 02-CR-1144 (VEC) (S.D.N.Y. Jan. 8, 2020), ECF No. 384. "In making its decision, a court must also consider "the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."" *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." See, e.g., *Ebbers*, 2020 WL 91399, at \*4 (S.D.N.Y. Jan. 8, 2020). However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments. *United States v. Beck*, 2019 WL 2716505, at \*5-6 (M.D.N.C. June 28, 2019); see also *Ebbers*, 2020 WL 91399, at \*4. Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at \*6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

## C. The Unprecedented Nature of this Emergency Compels the

11

## Court to Find the Exhaustion Requirement Waived.

The Court need not and should not wait for Jackson to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to Jackson. See generally *Washington v. Barr*, 925 F.3d 109, 120-21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.").

Federal courts have found that they can hear applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency. See *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF No. 642 (D. Mass. Mar. 17, 2020) (granting defendant's emergency motion based on COVID-19); see also *United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of prisoner with cancer). This accords with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes. See, e.g., *Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (citing *Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative

exhaustion requirements can be waived if delay would cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)). Those policies were articulated by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749 (1975):

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

422 U.S. at 765.

Conducting an "intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in *Bowen* that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place." 476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); see also *Rafeedie v. I.N.S.*,

880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the impending crisis, the unique exhaustion provision in § 3582(c)(1)(A) places this case squarely within *Bowen*'s holding. Under § 3582(c)(1)(A), exhaustion will "merely [ ] enable [Defendants] to receive the procedure they should have been afforded in the first place"—it will simply advance by what could be a crucial thirty days this Court's consideration of Jackson's motion for compassionate release. *Bowen*, 476 U.S. at 484. To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be brought either by the "Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . ." 18 U.S.C. § 3582(c)(1)(A) (emphasis added). In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear disputes in the absence of exhaustion. *Cf. Booth v. Churner*, 532 U.S. 731, 736 (2001)

14

(failure to exhaust under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained in federal court because that provision explicitly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added)).

Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept through FCI).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days. § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ." (emphasis added)). With this provision, Congress implicitly recognized that the policies underlying compassionate release are not

furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic process. Congress' concerns about delay are even more pronounced in the current public health crisis.

The policies underlying such requirements would not be furthered by strict adherence in this instance. Giving the BOP time to decide administrative applications for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise." *Salfi*, 422 U.S. at 765. The BOP already has provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release. See Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. And the FCI Legal Department has no institution-specific requirements for requesting compassionate release and no specific procedure in place for compassionate release during this pandemic. Thus, it would be futile to force defendants to exhaust their administrative remedies—at the cost of their health and, potentially, their lives.

## D. *COVID-19 Update*

Recently, COVID-19 vaccine has been approved but supplies are limited. The Associated Press ("AP") reported in November 2020 that documents obtained from BOP revealed that although coronavirus rates were surging in inmate populations,

vaccinations would be "reserved for staff" when they are received. When explaining its vaccination process, BOP said earlier on Tuesday it planned to offer vaccines to full-time bureau staff members, saying doing so "protects the staff member, the inmates at the facility, and the community." However, BOP spokesman Justin Long told the AP, "At this time, we can confirm high risk inmates in a few of the BOP facilities in different regions of the country have received the vaccine." The AP noted that BOP has not stated how many inmates have been vaccinated or what the selection process is. It is also unclear at this time how many doses of the vaccine BOP has received. The AP also reported that 3,624 federal inmates and 1,225 BOP staff members have tested positive for COVID-19 so far, with 171 inmate deaths due to the coronavirus.

Due to limited supplies, not everyone will be able to get a COVID-19 vaccine right away. Hence, the government and medical experts, advise that to protect yourself and help prevent spreading the virus to others, do the following:

- Wash your hands regularly for 20 seconds, with soap and water or alcohol-based hand rub;
- Cover your nose and mouth with a disposable tissue or flexed elbow when you cough or sneeze;
- Avoid close contact (1 meter or 3 feet) with people who are unwell; and
- Stay home and self-isolate from others in the household if you feel unwell.

17

**Note:** There are several different types of vaccines in development. All of them teach our immune systems how to recognize and fight the virus that causes COVID-19. Sometimes this process can cause symptoms, such as fever. These symptoms are normal and are a sign that the body is building protection against the virus that causes COVID-19. It typically takes a few weeks for the body to build immunity (protection against the virus that causes COVID-19) after vaccination. That means it's possible a person could be infected with the virus that causes COVID-19 just before or just after vaccination and still get sick. This is because the vaccine has not had enough time to provide protection. See https://www.cdc.gov/coronavirus/ 2019-ncov/vaccines/facts.html (last accessed January 13, 2021).

With the speed and unpredictability of this pandemic worldwide—now U.S. is the epicenter of the pandemic—waiting even 30 days will be too late. Accordingly, this Court should exercise jurisdiction over Jackson's emergency motion for compassionate release and dispense with the BOP requirements under 18 U.S.C. § 3582(c)(1)(A)(i).

Indeed, in *United States v. Wilson Perez*, 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020), ECF No. 98, the Honorable Analisa Torres deemed the exhaustion requirement waived, and held that all three exceptions (futility, incapability, and prejudice) apply to the instant circumstances. See also *United States v. Latrice Colvin*, No. 19 Cr. 179

18

(JBA) (D. Conn. Apr. 2, 2020), ECF No. 38 (granting compassionate release and waiving exhaustion requirement); *United States v. Zukerman*, 16 Cr. 194 (AT), 2020WL1659880 (S.D.N.Y. Apr. 3, 2020), at *2 (same); *United States v. Powell*, 94 Cr. 316 (D.D.C. Mar. 28, 2020), ECF No. 98 (same).

## E. "Extraordinary and Compelling Reasons" Warrant a Reduction in Jackson's Sentence.

### 1. COVID-19 Is a Public Health Disaster That Threatens Vulnerable Incarcerated Persons like Jackson.

The COVID-19 pandemic continues to roil the United States. As of April 15, 2021, the BOP has 126,247 federal inmates in BOP-managed institutions and 13,636 in community-based facilities. The BOP staff complement is approximately 36,000. There are 352 federal inmates and 815 BOP staff who have confirmed positive test results for COVID-19 nationwide. There have been 234 federal inmate deaths and 4 BOP staff member deaths attributed to COVID-19 disease. See https://www.bop.gov/coronavirus/ (last accessed April 29, 2021). Bottom line, Federal facilities are not immune.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms

19

and sinks. . . . . They are not given tissues or sufficient hygiene supplies"); Joseph A. Bick (2007). *Infection Control in Jails and Prisons*. Clinical Infectious Diseases 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.

"The [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.10

Indeed, as the Second Circuit recently observed, present information about the COVID-19 epidemic and the BOPs' prior failings in 2019 to adequately protect detainees and allow them access to counsel and their families following a fire and power outages suggest that the virus' impact will likely be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

2.    Jackson's Vulnerability to COVID-19 Due to His High

20

### Medical Risk Is an Extraordinary and Compelling Reason That Warrants a Sentence Reduction.

Jackson is particularly vulnerable to COVID-19 because of his sickle cell disease. At the time of sentencing, the Court could not have anticipated that Jackson's disease will place him in the "high risk" category nor the existence of the COVID-19. As the COVID-19 pandemic continues, it potentially poses a particular issue for older people and people with pre-existing medical conditions (such as diabetes, heart disease, lung disease, and autoimmune disease) appear to be more vulnerable to becoming severely ill with the COVID-19 virus.

Since COVID-19, "extraordinary and compelling reasons" can usually be demonstrated by having a medical ailment or co-morbidity that increases the risk of severe illness from the virus that causes COVID-19 (i.e., cancer, type II diabetes, obesity, heart conditions, sickle cell disease) and a showing that COVID-19 cases in the prison are rising or likely to rise. Other factors, such as advanced age or compelling family circumstances, can also sometimes satisfy the "extraordinary and compelling" standard.

*Study Finds People with Sickle Cell Disease Who Developed Coronavirus Disease Have High Rates of Hospitalization, Intensive Care Unit Admission, and Death*

Sickle cell disease (SCD) is an inherited blood cell disorder estimated to affect 100,000 people in the United States. It is most common among

Black or African-American people, affecting an estimated 1 in 365 Black or African-American people in the United States. While healthy red blood cells are round and move through small blood vessels to carry oxygen to all parts of the body, in someone who has SCD, the red blood cells become hard and sticky and look like a C-shaped farm tool called a "sickle." When these cells travel through small blood vessels, their sickle shape causes them to get stuck and clog the blood flow. The blockage can cause pain and other serious problems such as infection, acute chest syndrome, and stroke. SCD affects nearly every organ system in the body and causes a lower life expectancy.

Previous studies report higher influenza severity and hospitalization rates in people with SCD than without SCD. Less is known about the novel coronavirus disease (COVID-19) in people with SCD.

## About This Study
The Medical College of Wisconsin SECURE-SCD Registry collects information on COVID-19 cases in people with SCD. Links to the registry have been widely distributed to SCD healthcare providers through medical professional and patient advocacy networks and CDC's website. Providers are asked to report all confirmed COVID-19 cases among their patients with SCD.

Researchers from the Medical College of Wisconsin and CDC conducted an analysis of COVID-19 cases among people with SCD who are living in the United States and were reported to the SECURE-SCD Registry between March 20, 2020 and May 21, 2020.

## Main Findings of This Study
From March 20–May 21, 2020, 178 people with SCD in the United States were reported to the SCD–COVID-19 case registry. Below are the main findings:

- Average age was 28.6 years.
- The majority had one or more SCD-related complications reported in the past. (For example, more than half had been hospitalized three or more times during the past 3 years for a pain crisis.)

- 122 (69%) patients were hospitalized during their COVID-19 illness, 19 (11%) were admitted to the intensive care unit (ICU) and 13 (7%) died.
- Given their young average age (28.6 years), these rates are striking. A previous report of the U.S. population at-large* indicates the rate of death among people with COVID-19 is less than 1% for both people 20–44 years of age and those 45–54 years of age.

While the findings of high hospitalization, ICU admission, and death rates among people with COVID-19 and SCD are not completely surprising, given the known health risks associated with SCD, they highlight the need for people with SCD to take extra precautions to prevent COVID-19.

See https://www.cdc.gov/ncbddd/sicklecell/features/scd-and-covid-19.html.

### COVID-19 Reinfection

Despite the anecdotal reports from doctors about patients becoming reinfected with the coronavirus, researchers say there's no evidence supporting the notion that people can become reinfected with the virus within a short time period. Further, the researchers noted that none of the patients who re-tested positive for the coronavirus transmitted the pathogen to others. As for studies showing that antibodies for the novel coronavirus decline over time, researchers say that's how antibodies work for a host of viruses.

Michael Mina, an immunologist at Harvard University, said although those studies have left some people "scratching their heads saying, 'What an extraordinarily odd virus that it's not leading to robust immunity,' … they're totally wrong."
Some research has resulted in different findings regarding coronavirus antibody levels over time. For example, results from a separate study that were released preprint and haven't been peer reviewed found that 120 patients who were infected with the coronavirus and experienced mild or moderate symptoms of COVID-19 had stable levels of coronavirus antibodies for at least three months post infection—and in some cases,

23

those levels increased over that time.

In addition, even if someone who had been infected with the coronavirus didn't develop antibodies for the pathogen, a person's T-cells and B-cells could fight off reinfection, public health experts say.

## *People Experience COVID-19 Symptoms Twice*

Clinicians say more research is needed to answer the question of why some patients appear to fall ill with COVID-19 more than once, but some believe that such patients simply relapse because the coronavirus lays dormant in their bodies and reemerges—an occurrence that's been seen with some viruses that often result in lifetime immunity, such as the chickenpox virus, according to Daniel Griffin, an infectious diseases doctor and researcher at Columbia University Medical Center.

It also may be possible that some patients experience a long course of infection that ramps up months after they first contract the coronavirus and initially experience symptoms of COVID-19, some experts have said. And others have speculated that some patients may contract a different virus with similar symptoms to COVID-19 and assume they've been reinfected with the coronavirus.

## *'No One Wants to Dismiss the Possibility' of Reinfection Completely*

However, while most experts say they don't think it's likely people can contract the coronavirus more than once within a short period of time, "no one wants to dismiss the possibility" of reinfection altogether, Gandhi said. And Griffin noted that, if researchers eventually find two different versions of the novel coronavirus' genetic code in one patient's body, it could point to two separate infections.

"This is one of those things I really don't want to be true," Griffin said, "[b]ut a lot of us are starting to say, 'I'm willing to entertain it as a possibility. Let's keep our eyes out and start watching'" (Johnson/Cha, Washington Post, 7/22; Resnick/Irfan, Vox, 7/22; Mandavilli, New York Times, 7/22; Craig, Monmouth Daily Voice, 7/9; Sternlicht, Forbes,

5/19).

See https://www.advisory.com/daily-briefing/2020/07/24/covid-reinfection#:~:text
=Research%20suggests%20coronavirus%20reinfection%20is,a%20short%20time%
20period.

Jackson is stuck in prison, which means he lives in an environment where living

in close quarters with inmates is inevitable and transmission of highly contagious

diseases like COVID-19 is most likely to happen.

Hence, it is appropriate for Jackson to be released into an environment where he

and his loved ones can control and direct his medical care. It is important for all of us

to remember that convicted criminals are sent to prison as punishment—not for

punishment. People who are severely debilitated or are in the midst of dying are usually

no longer a threat to society, and there is not a compelling social advantage to keeping

them in prison.

**Note:** According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.

    a.    Based on what we know now, those at high-risk for severe illness from COVID-19 are:

- People 60 years and older
- People who live in a nursing home or long-term care facility

b. People of all ages with underlying medical conditions, particularly if not well controlled, including:

- People with chronic lung disease or moderate to severe asthma
- People who have serious heart conditions
- People who are immunocompromised
- Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications
- People with severe obesity (body mass index [BMI] of 40 or higher)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease

are the hallmark of those who are most endangered by the instant pandemic. These are

"extraordinary and compelling reasons" for his release. See Note 1(A), § 1B1.13

(expressly recognizing that "other reasons" may exist for granting compassionate

release), see Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and

compelling reasons exists "other than, or in combination with, the reasons described

in subdivisions (A) through (C)."). Here, Jackson's high susceptibility to COVID-19

falls within the purview of this catchall. Moreover, courts have noted that while §

1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary

and compelling reason to warrant a sentence reduction, the inquiry does not end there.

Rather, district courts have the freedom to shape the contours of what constitutes an

extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like USP to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Jackson suffers from ailments that have already been identified as "high risk," this Court should find that Jackson's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

The CDC and other medical authorities have found that COVID-19 is especially dangerous for people of all ages with underlying medical conditions. Those with conditions such as sickle cell disease are also especially vulnerable to and at higher risk for serious complications from COVID, including death. www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. The CDC recently added individuals with hemoglobin disorders, but specifically sickle cell disease, to the list of at-risk health conditions for COVID.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act

27

(FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible." And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

Finally, in the last few months, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island. Approximately 1,700 inmates have been released from Los Angeles County Jails, and 1,000 inmates are to be released from New Jersey jails. Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this

28

Court.

3. Courts Have Granted Compassionate Release in Light of the Instant Pandemic.

Courts in the Southern and Eastern Districts of New York have granted compassionate release based on COVID-19. See *United States v. Wilson Perez*, No. 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020), ECF No. 98, (granting release based on health issues and finding court could waive exhaustion requirement; government did not object based on defendant's medical conditions); *United States v. Mark Resnick*, No. 12 Cr. 152 (CM) (S.D.N.Y. April 2, 2020), ECF No. 461 (granting compassionate release because of defendant's age and medical conditions in light of COVID-19); *United States v. Eli Dana*, No. 14 Cr. 405 (JMF) (S.D.N.Y. Mar. 31, 2020), ECF No. 108 (granting compassionate release motion, where government consented, because of defendant's age and medical conditions and the risk posed by COVID-19); *United States v. Damian Campagna*, No. 16 Cr. 78 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (granting compassionate release sentencing reduction to defendant convicted of firearms offenses based on defendant's health and threat he faced from COVID-19; government consented to reduction and agreed health issues and COVID-19 were basis for relief); *United States v. Daniel Hernandez*, No. 18 Cr. 834 (PAE) (S.D.N.Y. Apr. 1, 2020), ECF No. 446 (granting compassionate release

29

after BOP denied the request and converting remaining sentence to home confinement); *United States v. Jose Maria Marin*, No. 15 Cr. 252 (PKC) (E.D.N.Y. Mar. 30, 2020), ECF No. 1325-1326 (waiving exhaustion requirement and granting compassionate release to defendant based on special risks he faced from COVID-19).

So, too, have courts across the country. See *United States v. Andre Williams*, No. 04 Cr. 95 (MCR) (N.D. Fla. Apr. 1, 2020) (granting release based on defendant's health and COVID-19); *United States v. Teresa Ann Gonzalez*, No. 18 Cr. 232 (TOR) (E.D. Wa. Mar. 25, 2020), ECF No. 834 (waiving any further exhaustion attempts as futile and granting compassionate release based on defendant's health issues and COVID-19 pandemic); *United States v. Jeremy Rodriguez*, No. 03 Cr. 271 (AB) (E.D. Pa. Apr. 1, 2020), ECF No. 135 (finding court has independent authority to determine "extraordinary and compelling" reasons and granting compassionate release based in part on defendant's health and COVID-19; no exhaustion issue because 30 days had passed); *United States v. Pedro Muniz*, No. 09 Cr. 199 (S.D. Tex. Mar. 30, 2020), ECF No. 578 (granting compassionate release based on health conditions that made inmate susceptible to COVID-19); *United States v. Samuel H. Powell*, No. 94 Cr. 316 (ESH) (D.D.C. Mar. 27, 2020), ECF No. 97 (granting compassionate release for 55-year old defendant with respiratory problems in light of outbreak, without waiting for 30 days or other exhaustion of administrative remedies through the BOP); *United States v.*

*Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT) (D. Mass. Mar. 17, 2020), ECF No. 642 (granting defendant's emergency motion based on COVID-19).

See also *United States v. McCall*, Case No. 2:18cr95-MHT (M.D. Al. Jun. 4, 2020), granting compassionate release to prisoner who has sickle cell disease because two Bureau of Prisons (BOP) contract physicians as well as a sickle cell disease expert concludes that McCall's particular circumstances pose an urgent life-or-death situation that the BOP is unable to address in the face of the COVID-19 outbreak

at the facility housing McCall; and *United States v. Thomas*, Case No. 10-30046 (C.D. Ill. Aug. 21, 2020) (the government conceded that sickle cell disease is a serious illness in which patients have two genes that cause the production of abnormal hemoglobin (the substance in red blood cells that helps carry oxygen), individuals with sickle cell trait carry only one defective gene and typically live normal lives. Rarely, extreme conditions such as severe dehydration and high-intensity physical activity can lead to serious health issues, including sudden death, for individuals with sickle cell trait).

## IV.THE CARES ACT

On March 13, 2020, President Donald Trump declared a state of emergency due to the novel COVID-19 outbreak. On March 25, the U.S. Senate passed the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act) to provide emergency assistance to people affected by the outbreak.

The CARES Act reflects our country's immense concern for people who have been and will be harmed by the pandemic, including people incarcerated in the Federal Bureau of Prisons (BOP). Section 12003(b)(2) of the CARES Act permits the Director of the BOP to lengthen the maximum amount of time that a prisoner may be placed in home confinement, if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP.

Previous law dictated that the Director of the BOP had authority to place a prisoner in home confinement for the shorter of 10 percent of a person's term of imprisonment or 6 months, but the CARES Act greatly expands that authority to allow prisoners to be transferred to home confinement earlier in their sentence. Under the CARES Act, the Director may lengthen the maximum term of home confinement to whatever he determines appropriate during the pandemic. Given the current state of emergency, we urge you to use the CARES Act to quickly transfer prisoners who are at high risk for complications from COVID-19 to home confinement.

COVID-19 is an unprecedented crisis, with widespread harm. The CDC has issued guidance that people over 60 years old and individuals with chronic medical conditions are at a higher risk of contracting COVID-19 and of experiencing more serious complications or death as a result of the illness. The CDC has also advised these individuals to avoid crowds, stay at home as much as possible. Similarly, the

32

CDC has advised that all people practice heightened levels of hygiene and "social distancing," limiting close contact with others as much as possible. People in BOP custody are unable to take any such proactive steps to protect themselves. Indeed, conditions of confinement and the needs of security are often in direct contrast with best practices for limiting contagion and promoting public health during a pandemic.

It is indisputable that COVID-19 and related emergency conditions materially affect the functioning of the BOP. The BOP has suspended visitation and imposed a 14-day quarantine on new transfers. Programming and meal schedules have been dramatically altered.

Of special concern is the fact that many facilities utilize close quarter housing and are unable to adequately distance prisoners, all but guaranteeing a rapid spread of the virus once it takes hold in a facility. That COVID-19 will further materially alter BOP's functioning in the weeks and months to come is assured. The spread of the virus within BOP facilities puts prison staff at high risk of contracting the disease at their workplace. Staffing shortages, including of health care workers, are bound to occur as personnel fall ill and self isolate. The BOP's medical facilities are not staffed or equipped to deal with high numbers of seriously ill people who will need critical care that could last for weeks, as serious cases of COVID-19 do.

33

Meanwhile, many individuals under BOP custody who are nearing release have already been transferred to residential reentry centers (RRCs). Unfortunately, conditions at RRCs have also been greatly impacted by COVID-19. Movement has been restricted, employment opportunities have halted, people are confined in tight quarters and don't have the resources to comply with CDC guidance addressing their hygiene or freedom to practice social distancing. Individuals in home confinement would be far better equipped to prevent the spread of COVID-19, and they would be a far lower risk to the BOP or the public's health care system.

Here, although those factors fully support the substantial sentence originally imposed, in the current context of Jackson's incurable medical condition, Jackson's family believes compassionate release is appropriate at this time.

It is essential to also note that since Jackson's incarceration began, he has taken numerous steps to attempt to improve himself in "post-conviction rehabilitation." See Exhibit 1. Based on his medical condition and the world's take on the global pandemic right now, and good time credits he has served, Jackson have met all the requirements for compassionate release.

If granted compassionate release, Jackson will reside with his family– where he will be able to isolate himself and take the same precautionary measures that all Americans are taking: frequent hand washing, sanitizing his living space, and seeking

34

medical care if necessary. None of these precautions are available in prison. Jackson will receive medical care from his doctors, who are located near their home. Further information about these release plans upon request.

## V. CONCLUSION

For the above and foregoing reasons, Jackson prays this Court would consider his Motion for Compassionate Release/Reduction in Sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018, based upon the "extraordinary and compelling reasons" and release him to home confinement or hold a hearing.

Respectfully submitted,

Dated: May 11, 2021

LODGY JACKSON
REG. NO. 38880-044
USP POLLOCK
U.S. PENITENTIARY
P.O. BOX 2099
POLLOCK, LA 71467

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2021, a true and correct copy of the above and foregoing Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018 was sent via U. S. Mail, postage prepaid, Tiffany G. Becker, Assistant U.S. Attorney at U.S. Attorney's Office - St. Louis, 111 S. Tenth Street, 20th Floor, St. Louis, MO 63102.

LODGY JACKSON

35

## EXHIBIT 1:

- **Summary Reentry Plan Progress Report**
- **Sentence Monitoring Computation Data**



## Summary Reentry Plan - Progress Report

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: JACKSON, LODGY 38880-044



| | | | |
|---|---|---|---|
| Facility: | POL POLLOCK USP | Custody Level: | IN |
| Name: | JACKSON, LODGY | Security Level: | HIGH |
| Register No.: | 38880-044 | Proj. Rel Date: | 01-16-2040 |
| Quarters: | C03-357U | Release Method: | GCT REL |
| Age: | 30 | DNA Status: | POL04137 / 03-27-2014 |
| Date of Birth: | 10-18-1989 | | |

### Offenses and Sentences Imposed

| Charge | Terms In Effect |
|---|---|
| 21:846 AND 21:841(B)(1)(B) CONSPIRACY TO POSSESS WITH INTENT TO DISTRIBUTE COCAINE - COUNT I 18:924(O) CONSPIRACY TO POSSESS A FIREARM IN FURTHERANCE OF A DRUG TRAFFICKING CRIME - COUNT II | 280 MONTHS |
| 18:924(C)(1)(A) & 18:924(J)(1), POSSESSION OF A FIREARM IN FURTHERANCE OF A DRUG TRAFFICKING CRIME (CT III). | 120 MONTHS |

Date Sentence Computation Began: 12-12-2013

Sentencing District: MISSOURI, EASTERN DISTRICT

| Days FSGT / WSGT / DGCT | Days GCT or EGT / SGT | Time Served | + Jail Credit - InOp Time |
|---|---|---|---|
| 0 / 0 / 95 | 391 | Years: 9 Months: 3 Days: 25 | + 938 JC - 0 InOp |

### Detainers

| Detaining Agency | Remarks |
|---|---|
| NO DETAINER | |

### Program Plans

Inmate Jackson began his current term of incarceration on March 26, 2014. At his program review, he was recommended to obtain his GED. He was also encouraged to obtain employment while incarcerated and to satisfy any court ordered financial obligations. Inmate Jackson arrived at FCC Pollock (USP) on August 20, 2019. At his initial classification, Inmate Jackson was recommended to participate in the Release Preparation Programs. He was encouraged to maintain clear conduct. Inmate Jackson was recommended to complete all six core topics of the Release Preparation Program (RPP) prior to his release date. He was also encouraged to apply for employment to assist with his release and financial obligations.

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| POL | REC AM-1 | M-F 7:30-3:30 | 06-30-2020 |

### Work Assignment Summary

Inmate Jackson has consistently earned average work evaluations during this period of incarceration.

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| POL | ESL HAS | ENGLISH PROFICIENT | 04-01-2014 |
| POL | GED HAS | COMPLETED GED OR HS DIPLOMA | 06-14-2014 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| POL | C | ACT WORKKEYS CERTIFICATE CLASS | 06-29-2020 | 08-11-2020 |
| POL | C | PERSONAL GWTH - 7HABITS RPP6 | 06-29-2020 | 07-28-2020 |
| BMM | C | SPINNING I TRAINING CLASS RPP1 | 01-12-2019 | 02-28-2019 |
| BMM | C | BUILD TRADES VT, RPP 2 | 10-17-2018 | 02-20-2019 |
| BMM | C | SMALL BUSINES MGT,730-1030 CT2 | 05-09-2018 | 10-31-2018 |
| BMM | C | ABDOMINAL TRAINING CLASS.RPP 1 | 07-09-2018 | 08-29-2018 |
| BMM | C | CARDIO & MORE TRAIN CLASS RPP1 | 04-03-2018 | 06-17-2018 |
| BMM | C | HIGH INTENSITY TRAIN CLAS RPP1 | 11-06-2017 | 12-29-2017 |
| POL | C | MICROCOMPUTER APPLICATIONS | 07-08-2016 | 04-20-2017 |


| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| POL | C | MS ACCESS 7:30A-10:30A | 01-12-2017 | 04-20-2017 |
| POL | C | MS EXCEL 7:30A-10:30A | 12-20-2016 | 01-12-2017 |
| POL | C | MICROSOFTWORD M-F 7:30-10:30AM | 10-31-2016 | 12-20-2016 |
| POL | C | KEYBOARDING 7:30A-10:30A | 07-08-2016 | 10-31-2016 |
| POL | C | KEYBOARDING 10-1130 A.M. | 09-01-2015 | 12-31-2015 |
| POL | C | COMMUNITY RESOURCES RPP 6 | 02-20-2015 | 02-20-2015 |
| POL | C | DRUG EDUCATION | 11-18-2014 | 12-08-2014 |
| POL | W | PM PGED 5 | 07-07-2014 | 08-14-2014 |
| POL | C | USP CROCHET CLASS | 07-07-2014 | 08-06-2014 |
| POL | C | SPINNING CLASS | 04-21-2014 | 05-29-2014 |

### Education Information Summary

Inmate Jackson has successfully earned his GED while incarcerated. He has completed the following programs: Seven Habits-RPP6, VT Building Trades-RPP2, Microsoft Access, Microsoft Excel, and Microsoft Word, Keyboarding and Drug Education.

### Discipline Reports

| Hearing Date | Prohibited Acts |
|--------------|-----------------|
| 10-28-2019 | 205 : ENGAGING IN SEXUAL ACTS |
| 06-13-2019 | 206 : MAKING SEXUAL PROPOSAL/THREAT |
| 06-16-2015 | 113 : POSSESSING DRUGS/ALCOHOL |
| 02-04-2015 | 397 : PHONE ABUSE - NO CIRCUMVENTION |
| 01-29-2015 | 305 : POSSESSING UNAUTHORIZED ITEM |
| 09-16-2014 | 305 : POSSESSING UNAUTHORIZED ITEM |

### Discipline Summary

Inmate Jackson has received the following incident reports during his incarceration: Engaging in Sexual Acts, Making Sexual Proposal/Threats, Possessing Drugs/Alcohol, Phone Abuse, and Possessing an Unauthorized Item. His interaction with staff and inmates is appropriate and no management concerns are noted at this time.

### ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
|------|------------|--------|-------|------|
| POL | A-DES | TRANSFER RECEIVED | 08-20-2019 | CURRENT |
| BMM | A-DES | TRANSFER RECEIVED | 06-26-2017 | 08-14-2019 |
| POL | A-DES | US DISTRICT COURT COMMITMENT | 03-25-2014 | 06-14-2017 |

### Current Care Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 04-03-2014 |
| CARE1-MH | CARE1-MENTAL HEALTH | 03-28-2014 |

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| NO PAPER | NO PAPER MEDICAL RECORD | 03-28-2014 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 04-03-2014 |
| YES F/S | CLEARED FOR FOOD SERVICE | 08-20-2019 |

### Current PTP Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| CHG DECL | CHALLENGE DECLINE | 10-06-2014 |

### Current Drug Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| DAP REFER | DRUG ABUSE PROGRAM REFER | 06-19-2015 |
| ED COMP | DRUG EDUCATION COMPLETE | 12-08-2014 |

### Physical and Mental Health Summary

Inmate Jackson is on regular duty medical status with no restrictions. Psychology staff has not expressed mental health concerns at this time. He has completed the Drug Education program.



## FRP Details

Most Recent Payment Plan

| | | | | | |
|---|---|---|---|---|---|
| **FRP Assignment:** | **COMPLT** | **FINANC RESP-COMPLETED** | | **Start: 06-12-2017** | |
| Inmate Decision: | **AGREED** | $100.00 | Frequency: **SINGLE** | | |
| Payments past 6 months: | $0.00 | | Obligation Balance: $0.00 | | |

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $300.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | |
| 2 | REST NV | $1,500.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | |

## Financial Responsibility Summary

Inmate Jackson has completed making payments toward his court ordered financial obligation.

## Release Planning

Inmate Jackson will reside in Houston, Texas, upon release from federal custody. Inmate Jackson has a Projected Release Date of January 16, 2040. Inmate Jackson will be recommended for halfway house placement 12-18 months before his release date.

## General Comments

Inmate Jackson has been recommended to secure birth certificate prior to release to prepare for employment and reintegration in the community.



### Summary Reentry Plan - Progress Report
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: JACKSON, LODGY 38880-044

SEQUENCE: 00200816
Report Date: 09-09-2020

|  |  |
|---|---|
| Name: | JACKSON, LODGY |
| Register Num: | **38880-044** |
| Age: | 30 |
| Date of Birth: | 10-18-1989 |
| DNA Status: | POL04137 / 03-27-2014 |

---

Inmate    (JACKSON, LODGY, Register Num: 38880-044)

Date

---

Chairperson

Case Manager

Date

Date

REGNO..: 38880-044 NAME: JACKSON, LODGY

FBI NO...........: 931912KC6                DATE OF BIRTH: 10-18-1989  AGE:  30
ARS1.............: POL/A-DES
UNIT.............: C                        QUARTERS.....: C03-357U
DETAINERS........: NO                       NOTIFICATIONS: YES

HOME DETENTION ELIGIBILITY DATE: 07-16-2039

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE: 01-16-2040 VIA GCT REL


---------------------CURRENT JUDGMENT/WARRANT NO: 010 -----------------------

COURT OF JURISDICTION...........: MISSOURI, EASTERN DISTRICT
DOCKET NUMBER...................: 4:11CR00351 AGF
JUDGE...........................: FLEISSIG
DATE SENTENCED/PROBATION IMPOSED: 12-12-2013
DATE COMMITTED..................: 03-25-2014
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO

                 FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.: $300.00         $00.00          $00.00       $00.00

RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO       AMOUNT:  $1,500.00

------------------------CURRENT OBLIGATION NO: 010 --------------------------
OFFENSE CODE....:  391    21:846 SEC 841-851 ATTEMPT
OFF/CHG: 21:846 AND 21:841(B)(1)(B) CONSPIRACY TO POSSESS WITH INTENT
         TO DISTRIBUTE COCAINE - COUNT I
         18:924(O) CONSPIRACY TO POSSESS A FIREARM IN FURTHERANCE OF A
         DRUG TRAFFICKING CRIME - COUNT II

SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.:  280 MONTHS
TERM OF SUPERVISION............:     5 YEARS
DATE OF OFFENSE................: 04-23-2011


G0002        MORE PAGES TO FOLLOW . . .

REGNO..: 38880-044 NAME: JACKSON, LODGY


------------------------CURRENT OBLIGATION NO: 020 --------------------------
OFFENSE CODE....: 130     18:924(C) FIREARMS LAWS          FSA INELIGIBLE
OFF/CHG: 18:924(C)(1)(A) & 18:924(J)(1), POSSESSION OF A FIREARM IN
         FURTHERANCE OF A DRUG TRAFFICKING CRIME  (CT III).

  SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
  SENTENCE IMPOSED/TIME TO SERVE.:  120 MONTHS
  TERM OF SUPERVISION............:    5 YEARS
  RELATIONSHIP OF THIS OBLIGATION
   TO OTHERS FOR THE OFFENDER....: CS TO OBLG 010
  DATE OF OFFENSE................: 04-22-2011

------------------------CURRENT COMPUTATION NO: 010 --------------------------

COMPUTATION 010 WAS LAST UPDATED ON 11-04-2019 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 02-18-2014 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010, 010 020

DATE COMPUTATION BEGAN..........: 12-12-2013
AGGREGATED SENTENCE PROCEDURE...: AGGREGATE GROUP 800 PLRA
TOTAL TERM IN EFFECT............:  400 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:   33 YEARS     4 MONTHS
AGGREGATED TERM OF SUPERVISION..:    5 YEARS
EARLIEST DATE OF OFFENSE........: 04-22-2011

JAIL CREDIT.....................:  FROM DATE      THRU DATE
                                   05-19-2011    12-11-2013


G0002     MORE PAGES TO FOLLOW . . .

REGNO..: 38880-044 NAME: JACKSON, LODGY


TOTAL PRIOR CREDIT TIME.........: 938
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 1704
TOTAL GCT EARNED................: 391
STATUTORY RELEASE DATE PROJECTED: 01-16-2040
ELDERLY OFFENDER TWO THIRDS DATE: 08-07-2033
EXPIRATION FULL TERM DATE.......: 09-15-2044
TIME SERVED.....................:        9 YEARS     3 MONTHS     22 DAYS
PERCENTAGE OF FULL TERM SERVED..: 27.9
PERCENT OF STATUTORY TERM SERVED: 32.4

PROJECTED SATISFACTION DATE.....: 01-16-2040
PROJECTED SATISFACTION METHOD...: GCT REL

REMARKS.......: 6-16-15: COMP UPDTD TO REFLECT GCT DIS.T/DJK.
               6-14-19 DIS/GCT T/ARL
               11042019 DIS 3309595 T/KRB


G0002      MORE PAGES TO FOLLOW . . .

SENTENCE MONITORING
COMPUTATION DATA
AS OF 09-09-2020

\*     09-09-2020
\*     14:03:27

REGNO..: 38880-044 NAME: JACKSON, LODGY

---------------------------- CURRENT NOTIFIES: ----------------------------

NOTIFY NO....: 001
DATE RECEIVED: 04-11-2014
NAME OR TITLE: USMS EASTERN DISTRICT OF MISSOURI
AUTHORITY....: USMS JUDICIAL SECURITY DIVISION
ADDRESS......: 111 S. 10TH STREET
              ST. LOUIS, MO 63102
PHONE NUMBER.: (202) 307-6100
REMARKS......: CALL IMMEDIATELY IF I/M IS RELEASED, LEAVES, ESCAPES, OR TRANS

G0000       TRANSACTION SUCCESSFULLY COMPLETED

## **EXHIBIT 2**

- Health Services

## Health Services
## FCC Pollock, LA

To Inmate: Jackson, Lodgy                    Reg. #: 38880-044

Cell: C02-249U

From: Health Services

___

As per your provider, we would like to inform you have sickle cell trait. As of now, there is
nothing that has to be done and you will not have any symptoms. Attached is a handout for you
to review on sickle cell trait.

Thank you for your cooperation.

C. Rachel, MA

**C. Rachel, Medical Assistant**
**Health Services**
04/29/14    **FCC Pollock, LA**